Michael Barbee, *Pro Hac Vice*
Texas Bar No. 24082656

Casey Griffith, *Pro Hac Vice*
Texas Bar No. 24036687

Joshua Yun, *Pro Hac Vice*
Texas Bar No. 24120335

**GRIFFITH BARBEE PLLC**

1722 Routh Street, #910
Dallas, TX 75201
Tel: (214) 446-6020
E-mail: *Michael.Barbee@griffithbarbee.com*
E-mail: *Casey.Griffith@griffithbarbee.com*
E-mail: *Joshua.Yun@griffithbarbee.com*

Brian J. Foster, #012143
Ross P. Meyer, #28473

**FOSTER LAW PARTNERS**

4402 N. 36th Street, #127
Phoenix, AZ 85018
Tel: (602) 509-7345
E-mail: *brian@fosterlawpartners.com*
E-mail: *ross@meyerpllc.com*

**Attorneys for Plaintiff EPA USA Inc.**

**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| EPA USA Incorporated,<br><br>   *Plaintiff*<br><br>v.<br><br>Kamil Knap,<br><br>   *Defendant* | No. 2:24-cv-00749-GMS<br><br>**PLAINTIFF'S FIRST AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM** |

Per the Court's Order (Doc. 109), Plaintiff EPA USA Incorporated files its First Amended Motion for Partial Summary Judgment and Supporting Memorandum.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................iii

**INTRODUCTION**..........................................................................1

**STATEMENT OF FACTS**.................................................................1

**LEGAL STANDARD**......................................................................1

**ARGUMENT**..............................................................................2

    1.    EPA is entitled to summary judgment on declaratory relief relating to Knap's removal. ................................................................................... 2

        1.1.    Knap's removal as Director and Officer of EPA was valid. ............ 2

        1.2.    Knap's reliance on an agreement providing for his future ownership of EPA is misplaced. ........................................................3

        1.3.    Knap's post-termination conduct made on behalf of EPA was without authority............................................................................5

    2.    EPA is entitled to summary judgment on Knap's breach of fiduciary duties and related declaratory relief. .........................................................6

        2.1.    Knap breached his fiduciary duties by failing to turn over EPA's financial information and debt portfolios. ...........................7

        2.2.    Knap breached his fiduciary duties by using EPA's resources for personal purposes. ................................................... 8

        2.3.    Knap breached his fiduciary duties by failing to maintain proper corporate records............................................................ 8

        2.4.    Knap breached his fiduciary duties by allowing EPA's debt collection licenses to expire.........................................................10

        2.5.    Knap breached his fiduciary duties by using EPA's funds for personal travel expenses............................................................ 11

        2.6.    Knap breached his fiduciary duties by self-dealing in the purchase of and collections under EPA's debt portfolio. ..............12

3.      EPA is entitled to summary judgment on its trade secret misappropriation claims and associated declaratory relief. ......................13

    3.1.    EPA's debt portfolios—as compilations of debtor information and the processes used to collect from them—constitute trade secrets. ..............................................................................14

    3.2.    Knap misappropriated EPA's trade secrets by failing to return the debt portfolios to EPA upon his removal and continued to use them. ..................................................................15

4.      EPA is entitled to summary judgment on its CFAA claim for Knap's unauthorized access of EPA's computers. ................................16

    4.1.    EPA's computers, which are used in interstate commerce, qualify as "protected computers" under the CFAA. .....................17

    4.2.    Knap accessed EPA's computers "without authorization" after his removal. ..............................................................17

    4.3.    EPA suffered damage and loss due to Knap's unauthorized access to and destruction of EPA data. ...........................................18

    4.4.    EPA's losses exceeded $5,000. ..................................... 20

CONCLUSION .............................................................................. 20

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby*,
   447 U.S. 242 (1986) ...............................................................................................1

*AtPac, Inc. v. Aptitude Sols., Inc.*,
   730 F. Supp. 2d 1174 (E.D. Cal. 2010) ..........................................................19

*Calisi v. Unified Fin. Servs.*,
   232 Ariz. 103 (Ct. App. 2013)..........................................................................14

*F.T.C. v. Stefanchik*,
   559 F.3d 924 (9th Cir. 2009) ..............................................................................1

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ........................................................................ 20

*Galen v. Cty. of Los Angeles*,
   477 F.3d 652 (9th Cir. 2007) ............................................................................ 2

*Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood Disorder Treatment Inst. PLLC*,
   603 F. Supp. 3d 799 (Ariz. 2022) ...................................................................13

*InteliClear v. ETC Glob. Holdings*,
   978 F.3d 653 (9th Cir. 2020) ...........................................................................14

*Kadish v. Phoenix-Scottsdale. Sports Co.*,
   466 P.2d 794 (1970).........................................................................................11

*ReBath LLC v. HD Sols. LLC*,
   No. CV-19-04873-PHX-JJT, 2020 WL 7000071
   (D. Ariz. Sept. 18, 2020) .................................................................................14

*See Rhoads v. Harvey Publications, Inc.*,
   145 Ariz. 142 (App. 1984)................................................................................ 8

*RN Ent., LLC v. Clement*,
   380 F. Supp. 3d 711 (M.D. Tenn. 2019) .......................................................19

*See hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022). .........................................................................17

*Sewell v. Bernardin*,
  795 F.3d 337 (2d Cir. 2015) ..................................................................19

*Siino v. Foresters Life Ins. & Annuity Co.*,
  133 F.4th 936 (9th Cir. 2025) ................................................................ 2

*SkyHop Tech., Inc. v. Narra*,
  58 F.4th 1211 (11th Cir. 2023) ...............................................................19

*United States v. Soybel*,
  13 F.4th 584 (7th Cir. 2021) ...................................................................19

*Van Buren v. United States*,
  593 U.S. 374 (2021) ...............................................................................17

*Xfinity Mobile v. Globalgurutech LLC*,
  No. CV-22-01950-PHX-SMB, 2025 WL 1397110
  (D. Ariz. May 14, 2025) .................................................................. 16, 19

*Zwicky v. Diamond Resorts Mgmt. Inc.*,
  343 F.R.D. 101 (D. Ariz. 2022). ...............................................................6

## STATUTES

18 U.S.C. § 1030 ....................................................................... 16, 18

18 U.S.C. § 1839 ..................................................................... 13, 14, 15

28 U.S.C. § 1832 ...............................................................................13

A.R.S. § 10-842 ..............................................................................6, 8

A.R.S. § 10-830 ......................................................................... passim

A.R.S. § 44-401 ..................................................................... 13, 14, 15

## INTRODUCTION

Plaintiff EPA USA Incorporated ("EPA") seeks partial summary judgment against Defendant Kamil Knap ("Knap") on the following claims: declaratory relief relating to Knap's removal, fiduciary duties, and trade secret misappropriation (**Count 1**); breach of his duties to EPA (**Count 5**); Computer Fraud and Abuse Act violations (**Count 3**); and trade secret misappropriation under both federal and Arizona law (**Counts 2 and 10**). *See* Compl. (Doc. 1).

The undisputed material facts here indicate a pattern of Knap's corporate misconduct that has damaged—and continues to damage—EPA and its operations.

## STATEMENT OF FACTS

EPA incorporates by reference its separately filed amended Statement of Facts ("SOF") and supporting exhibits. *See* Doc. 111.

## LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In support, the movant must cite to pertinent parts of the record, including documents, depositions, affidavits or declarations, discovery responses, or other materials. FED. R. CIV. P. 56(c)(1)(A).

To survive, nonmovants must then show "a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original) (citing *Anderson v. Liberty Lobby*, 447 U.S. 242, 257 (1986)). "A non-movant's bald assertions or a mere scintilla of

evidence in his favor are both insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007)).

## ARGUMENT

### 1.    EPA is entitled to summary judgment on declaratory relief relating to Knap's removal.

The undisputed facts justify declaratory relief establishing the validity of Knap's removal from EPA—and the invalidity of his subsequent actions. Specifically, EPA requests the Court find (1) the Unanimous Written Consents removing Knap as EPA's Director and Officer are valid and enforceable and (2) Knap's subsequent California business filings misrepresenting his positions at EPA are void or otherwise invalid. SOF ¶¶ 21–30.

Declaratory relief requires "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Siino v. Foresters Life Ins. & Annuity Co.*, 133 F.4th 936, 945 (9th Cir. 2025). To prevail, EPA need only "adduce an evidentiary record sufficient to support the terms of [its] requested declaration." *See id.*

Here, a justiciable controversy exists between the parties regarding the ownership, governance, and control of EPA. Even though EPA's sole shareholder removed Knap under corporate formalities, Knap still contends he is EPA's rightful owner and principal. EPA accordingly requests declaratory relief validating Knap's removal.

### 1.1.    Knap's removal as Director and Officer of EPA was valid.

EPA's sole shareholder, El Palo Alto PTE.LTD ("El Palo Alto"), rightfully removed Knap as Director and Officer of EPA under EPA's bylaws. Section 3.3 of the bylaws provides, "Any director may be removed at any time by vote of the stockholders then entitled to vote for the election of directors at a special meeting called for that

purpose, either with or without cause." SOF ¶ 4. Section 5.4 further provides "any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors for cause or without cause at any regular or special meeting." SOF ¶ 5.

El Palo Alto has continuously maintained 100% ownership of EPA's shares—it has never transferred ownership to any party, including Knap. SOF ¶ 2. On February 6, 2024, El Palo Alto issued Directors' Resolutions confirming El Palo Alto's intent to exercise its right as sole shareholder of EPA to remove Knap as Director of EPA and appoint a new Director in his place. SOF ¶ 21. A week later, El Palo Alto effected this intent by way of a Unanimous Written Consent ("UWC") of the Sole Shareholder of EPA (i.e., El Palo Alto) and replaced Knap with a new Director, Roman Vavron. SOF ¶ 22. Vavron, as Director, then issued a subsequent UWC of EPA's Board removing Knap as Secretary and CFO of EPA. SOF ¶ 23. Knap was thus properly removed as Director and Officer of EPA under EPA's bylaws.

### 1.2. Knap's reliance on an agreement providing for his future ownership of EPA is misplaced.

Even so, Knap maintains his removal was invalid "because [EPA] had been transferred to me in its entirety back on September 26, 2023." SOF ¶ 7. Specifically, Knap references an agreement among himself, El Palo Alto, and the majority shareholder of El Palo Alto, R2P Invest PTE.LTD ("R2P") that included terms under which Knap *would have* received ownership of EPA after separating from El Palo Alto and its other affiliates (the "Agreement") *if* he had performed his obligations. *Id.* The Agreement was meant to effect this separation on peaceful terms, even though Knap had already wasted over a million dollars in a futile attempt to make EPA profitable. SOF ¶ 43. But Knap failed to perform his obligations.

Under the Agreement, Knap—who at the time was a Director for EPA and a Director and minority shareholder of El Palo Alto—was required to provide EPA's and El Palo Alto's "P[&]L, Balance Sheet, and General Ledger" to R2P by October 9, 2023. SOF ¶ 8.

Knap also agreed to transfer his 33.33% shares in El Palo Alto to R2P, thereby conferring 100% ownership of El Palo Alto to R2P, and willingly resign as Director of El Palo Alto. SOF ¶¶ 9–11. Knap was also required to send notice of his resignation to El Palo Alto's banks, record the balances of EPA's accounts, and provide account access to R2P. SOF ¶ 11. And he agreed to deliver to R2P three of EPA's debt portfolios ("NPLs of LoanMe, NYCU, and ASE CU")—portfolios that debt collection entities like EPA and R2P rely on for their daily operation. SOF ¶ 12. In turn, Knap would transfer EPA to his name, rendering EPA no longer a subsidiary of El Palo Alto, and EPA would enjoy use of DebThor, R2P's software program facilitating debt collection, for two months. SOF ¶ 7. Knap had until October 16, 2023 to comply with these terms.

Knap failed to perform these obligations. He only provided EPA's P&L and Balance Sheet but not El Palo Alto's—the rest of the financial information was incomplete, inaccurate and unusable. SOF ¶ 14. Knap also never transferred his 33.33% interest in El Palo Alto to R2P, which would have required the execution of a Share Transfer Agreement and would have been recorded in El Palo Alto's books. SOF ¶ 15. Knap never willingly resigned from his role as El Palo Alto's Director—he was only removed after El Palo Alto invested significant time, money, and effort into abiding by Singapore law to effect Knap's removal on December 14, 2023. SOF ¶ 16. Knap also never delivered the debt portfolios. SOF ¶ 17. Despite EPA's attempts to secure Knap's compliance, Knap chose to ignore communications, made empty promises, sent inaccurate and incomplete information, and dodged questions, taking active measures to stall and derail his performance

under the Agreement. SOF ¶ 18. Thus, EPA terminated the Agreement on October 16, 2023. SOF ¶ 19.

Despite Knap's material failures to abide by the Agreement, he insists the Agreement granted him EPA ownership. But Knap cannot hinge this belief on a future promise to receive EPA ownership—especially when that promise was revoked after the agreement fell apart due to Knap's lack of performance. SOF ¶¶ 12–18. And importantly, the validity of the Agreement or the sufficiency of either party's performance are not dispositive issues here. Instead, the undisputed fact remains there was never a transfer of ownership of EPA to Knap—and Knap himself admits he has no written evidence showing the transfer of ownership of EPA to his name. SOF ¶ 3. EPA therefore remains wholly owned by El Palo Alto, and El Palo Alto wields the proper authority to remove and install EPA's directors under its bylaws. Thus, declaratory relief establishing the validity of EPA's removal of Knap is proper here.

Knap's deposition testimony confirmed he received the February 14, 2024 email notice of his removal and demand for return of EPA property. SOF ¶ 25. Despite receiving this notice, Knap admits he continued to operate EPA after February 14, 2024. SOF ¶ 27. And Knap failed—despite his alleged attempts—to comply with the express demand to return EPA's business records, passwords, and access credentials by February 28, 2024. SOF ¶ 31.

### 1.3.    Knap's post-termination conduct made on behalf of EPA was without authority.

Knap likewise lacked the authority to engage in actions on behalf of EPA after his removal. Section 3.1 of EPA's bylaws provides "the Board of Directors shall have the control and management of the business and affairs of the Corporation . . . ." SOF ¶ 6.

Thus, Knap, as a terminated Director and Officer of EPA, did not have the authority to conduct EPA business. SOF ¶¶ 21–23.

Namely, the Statements of Information Knap filed post-removal to name himself as EPA's Secretary, CEO, CFO, and sole Director are void or otherwise invalid. On February 13, 2024, EPA filed a Statement of Information with the State of California's Office of the Secretary of State, naming Roman Vavron as CEO and sole Director, and Bohuslav Kratena as CFO and Secretary. SOF ¶ 28. However, without any authority to conduct EPA business, Knap filed his own Statement of Information a week later, naming himself as holding all the foregoing positions. SOF ¶ 29. Knap did so despite receiving notice of his removal. SOF ¶ 30. More troublingly, when EPA filed a subsequent Statement of Information correcting Knap's misrepresentations, Knap *again* filed another Statement of Information falsely asserting his EPA authority. SOF ¶ 29.

Knap, no longer a Director or Officer of EPA, had no authority to file any documents changing EPA's corporate structure, much less to install himself as sole controller of EPA. Thus, Knap's Statements of Information holding himself out as such are void or invalid.

**2.    EPA is entitled to summary judgment on Knap's liability for breach of fiduciary duties and related declaratory relief.**

EPA requests summary judgment on Knap's liability breach of his duties to EPA, and narrower declaratory relief establishing his failure to provide EPA's property and operations as breaching his Director and Officer duties. To prevail at trial in a breach of fiduciary duty claim under Arizona law, EPA must establish the existence of a fiduciary duty, a breach of that duty, and damages resulting from the breach. *Zwicky v. Diamond Resorts Mgmt. Inc.*, 343 F.R.D. 101, 116 (D. Ariz. 2022).

Under Arizona law, corporate directors and officers are subject to stringent fiduciary duties of care, loyalty, and good faith in serving the corporation. A.R.S. §§ 10-830, 10-842. These statutorily defined duties require directors and officers to act "in good faith," "in a manner the director [or officer] reasonably believes to be in the corporation's best interests," and "with the care an ordinarily prudent person in a like position would exercise under similar circumstances." *Id.*

Here, as Director and Officer, Knap owed the highest duties of loyalty, care, and good faith—duties he breached through mismanagement and misconduct before his formal removal. Thus, EPA is entitled to judgment as a matter of law on its declaratory relief and standalone claim for breach of fiduciary duty.

### 2.1. Knap breached his fiduciary duties by failing to provide EPA's financial information and debt portfolios.

As argued above, Knap failed to provide EPA's key financial information and debt portfolios as contemplated in the Agreement, an agreement he did not fully perform. SOF ¶¶ 12–18. Knap's admissions confirm this pattern of inadequate performance during his tenure as Director and Officer. Knap does not deny that, while serving as a Director and Officer of EPA, he did not always report accurate financial statements to EPA's shareholder, El Palo Alto—despite his subjective belief that he did so in a timely fashion. SOF ¶ 32. These facts establish a pattern of failing to meet his fiduciary obligations to provide accurate information and comply with shareholder directives while he served as a fiduciary.

Knap's failure to turn over these debt portfolios, in contravention of El Palo Alto and R2P's directives, essentially impeded EPA's ability to maintain profitability. Evidence confirms that while he served as an EPA director and Officer, the agency's debt-collecting licenses expired without renewal in multiple states. SOF ¶ 33.

Knap's conduct contradicts a purported reasonable belief his failure to perform under the Agreement was in the best interests of the corporation, especially when his inaction harmed—and continues to harm—EPA's ability to operate. Accordingly, declaratory relief establishing his refusal to turn over EPA financial data and debt portfolios during his tenure as EPA Director and Officer constitutes a breach of his duties to EPA is proper here.

### 2.2. Knap breached his fiduciary duties by using EPA's resources for personal purposes.

Corporate officers and directors have a duty to avoid using corporate assets for personal benefit without proper authorization. *See Rhoads v. Harvey Publications, Inc.*, 145 Ariz. 142, 148 (App. 1984). Knap acknowledged this duty in his deposition, agreeing "officers have a duty to avoid using corporate assets for personal benefit without proper authorization" and "using corporate funds for personal expenses without proper documentation or authorization is a breach of fiduciary duty." SOF ¶ 34. Despite this duty, Knap repeatedly used EPA's resources for personal purposes. He admitted to using EPA funds to purchase hockey tickets for his parents because "that was in the end of the day, the only place there was any money. I had no more money." SOF ¶ 35. When asked if he used EPA funds to purchase the tickets instead of using his personal accounts, Knap answered affirmatively. SOF ¶ 36. This admission alone conclusively proves a breach of Knap's fiduciary duties.

### 2.3. Knap breached his fiduciary duties by failing to maintain proper corporate records.

Knap also breached his fiduciary duties by failing to maintain proper corporate records. Under Arizona law, corporate officers and directors are held to a duty of care, which requires them to exercise reasonable diligence and prudence in managing corporate

affairs. A.R.S. §§ 10-830, 10-842. This statutory duty encompasses maintaining proper corporate records as a component of responsible governance. Indeed, Knap himself acknowledged this obligation, explicitly agreeing that "proper financial documentation is part of meeting a director's fiduciary duty." SOF ¶ 37.

But Knap failed to maintain even the most basic corporate records for EPA. His sworn testimony reveals EPA did not maintain formal board minutes documenting major financial decisions under his leadership. SOF ¶ 38. He further admitted he maintained no formal documentation approving significant financial decisions for EPA, stating "[e]verything was discussed just over WhatsApp." SOF ¶ 39. Knap's testimony further confirms that as EPA's president, he understood his responsibility to maintain EPA's corporate minute book and corporate records, yet he admitted under oath he did not maintain EPA's corporate minute book at all. SOF ¶ 40.

Indeed, despite establishing *twenty-one* separate bank accounts for EPA, Knap implemented no written policies to document the specific purpose of each account and maintained no records indicating which expenses should be paid from which account. SOF ¶ 41. When questioned about what documentation was created to track movements of funds between these numerous accounts, Knap admitted, "There was no documentation done there." SOF ¶ 42. This absence of basic financial bookkeeping created an environment where corporate funds could be—and were—misused without detection.

These recordkeeping failures caused substantial and quantifiable harm to EPA. For example, due to Knap's dereliction in maintaining adequate financial records, he failed to file EPA's tax return in a timely manner, causing EPA to incur fees and blocking EPA's ability to renew its licensing. SOF ¶ 43. Similarly, Knap's failure to maintain EPA's debt collection licenses in multiple states directly impaired EPA's ability to conduct its core business operations in those jurisdictions. SOF ¶ 33.

The scope of harm from Knap's breaches is further evidenced by his post-removal conduct, which demonstrates his understanding of EPA's critical business operations and his deliberate decision to withhold them from EPA's new management. Although Knap's fiduciary duties ended upon his removal, his failure to return EPA's business records, passwords, and access credentials as demanded demonstrates both the scope of control he exercised during his tenure and the ongoing harm caused by his pre-removal failures to maintain proper systems and documentation. SOF ¶ 31.

### 2.4. Knap breached his fiduciary duties by allowing EPA's debt collection licenses to expire.

Corporate directors and officers have a fundamental duty to ensure their corporation maintains the licenses necessary to conduct its business operations. This duty flows directly from the statutory duty of care requiring directors and officers to act "with the care an ordinarily prudent person in a like position would exercise under similar circumstances" as outlined in A.R.S. § 10-830 (a)(2). This statute mandates that directors discharge their duties in good faith, with the care of an ordinarily prudent person, and in a manner they reasonably believe to be in the best interests of the corporation. *Id.*

The evidence confirms that while Knap served as an EPA Director and Officer, the agency's debt-collecting licenses expired without renewal in multiple states, including Idaho, Indiana, Maryland, Rhode Island, Arizona, and Texas. SOF ¶ 44. For a debt collection agency like EPA, maintaining active licenses in the states where it operates is not merely administrative—it is fundamental to the company's ability to conduct business and generate revenue legally.

Knap's admission that he allowed multiple state licenses to expire during his tenure as Director and Officer demonstrates a breach of his duty of care. SOF ¶ 33. An ordinarily prudent person in a similar position would have ensured that all necessary business

licenses remained current, particularly for a business whose operations depend entirely on maintaining such licenses. This breach directly harmed EPA's ability to conduct business in multiple states and exposed the company to potential regulatory penalties.

### 2.5. Knap breached his fiduciary duties by using EPA's funds for personal travel expenses.

The unauthorized use of corporate assets for personal benefit constitutes a breach of fiduciary duty, as seen in *Kadish v. Phoenix-Scottsdale. Sports Co.*, 466 P.2d 794, 798–99 (1970), the court held that the use of corporate funds for non-corporate purposes without authorization constituted improper and wrongful conduct by officers and directors who owed a fiduciary duty to the corporation. Knap acknowledged this duty, agreeing that "using corporate funds for personal expenses without proper documentation or authorization is a breach of fiduciary duty." SOF ¶ 34. Despite this acknowledgment, Knap systematically used EPA's resources for personal travel expenses.

Knap used EPA funds for his wife's travel on business trips. Sofia Liang regularly accompanied Knap on business trips funded by EPA. SOF ¶ 35. Liang helped Knap "arrange meetings" because he "didn't have personal assistant." SOF ¶ 35. When asked whether Liang was paid for her work during these trips, Knap admitted: "No. She was not paid." SOF ¶ 35. This arrangement allowed Knap to shift personal spousal travel costs to EPA under the pretext of unpaid business assistance.

Liang accompanied Knap on multiple trips, including September 2021, October 2021, and February 2023. SOF ¶ 35. Regarding a February 2023 Honolulu trip, Knap admitted it was "a combination of personal" with only a "minor interest" in business. SOF ¶ 35. Despite the acknowledged personal nature of this travel, EPA funded expenses for both Knap and his wife.

Knap approved his travel expenses without oversight. When asked who approved his travel expenses, Knap responded: "Me." SOF ¶ 35. EPA maintained no formal board minutes documenting travel approvals. SOF ¶ 38. Instead, "everything was discussed just over WhatsApp." SOF ¶ 39. This self-approval process enabled Knap to authorize personal expenditures without independent scrutiny, and this systematic misuse of corporate funds for personal travel demonstrates a breach of Knap's fiduciary duties to EPA.

### 2.6. Knap breached his fiduciary duties by self-dealing in the purchase of and collections under EPA's debt portfolio.

In September 2023, EPA purchased a debt portfolio from AltaOne. SOF ¶ 45. According to Knap, EPA contributed approximately $20,000 (20%) to the purchase of this debt portfolio. SOF ¶ 46. Knap claims he contributed approximately $80,000 of his own money (around 80%) to the purchase of this debt portfolio. Knap himself "approved" this co-purchase. SOF ¶ 47. There was "no written agreement" documenting his agreement with EPA to purchase and collect these debts. SOF ¶ 49. Yet Knap paid himself from EPA's accounts as "repayment on a revenue generated by EPA" from this portfolio. SOF ¶ 50.

Under A.R.S. § 10-830, directors must act "in a manner the director reasonably believes to be in the corporation's best interests." Knap breached this duty of loyalty by engaging in self-dealing with this transaction without following the proper process. Knap engaged in a transaction in which he had a personal financial interest (80% ownership of the debt portfolio) while serving as EPA's president and director. SOF ¶ 47. This arrangement primarily benefited Knap personally rather than EPA because while EPA paid for 20% of the portfolio, Knap retained 80% ownership and used EPA's collection services. This effectively converted corporate resources (collection capabilities, staff time) for his personal benefit. By collecting returns on his 80% investment and paying himself from

corporate funds based on his determination of what constituted a fair "repayment," Knap created a situation where his personal interests conflicted with EPA's interests.

A.R.S. § 10-830 requires directors to act "with the care an ordinarily prudent person in a like position would exercise under similar circumstances." No prudent director would enter into an undocumented arrangement where they personally own 80% of an asset while using corporate funds and then determine repayment terms themselves. Furthermore, Knap admitted there was "no written agreement" documenting this arrangement. SOF ¶ 49. An ordinarily prudent person would insist on written documentation for such a material transaction.

Under A.R.S. § 10-830, directors must perform duties "in good faith." The lack of documentation, board approval, or independent oversight suggests this transaction was not conducted in good faith. SOF ¶ 49. Knap's self-determination of "repayment" amounts appears arbitrary rather than based on fair dealing. SOF ¶ 50.

No genuine dispute of material fact exists regarding Knap's breach of fiduciary duties he owed to EPA, and partial summary judgment on this issue is therefore proper.

**3.      EPA is entitled to summary judgment on its trade secret misappropriation claims and associated declaratory relief.**

EPA seeks summary judgment against Knap for trade secret misappropriation under both the federal Defend Trade Secrets Act ("DTSA") and the Arizona Uniform Trade Secrets Act ("AUTSA"), along with declaratory relief establishing EPA's debt portfolios as trade secrets or otherwise confidential. SOF ¶ 52–83. Under both the DTSA and AUTSA, it is unlawful to misappropriate trade secrets. 28 U.S.C. § 1832, A.R.S. § 44-401. To state a colorable claim for misappropriation, the plaintiff must allege (1) it owns a trade secret, (2) the defendant misappropriated the trade secret, and (3) the misappropriation caused damages. *Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood*

*Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 809 (Ariz. 2022); 18 U.S.C. § 1839(5). The DTSA has an extra-jurisdictional requirement, requiring that the claim have a "nexus" to interstate commerce. As previously stated, EPA's operations extend at least to Texas and California. *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 7000071, at *2 (D. Ariz. Sept. 18, 2020).

### 3.1. EPA's debt portfolios—as compilations of debtor information and the processes used to collect from them—constitute trade secrets.

The plaintiff must first prove a legally protectable trade secret exists and the trade secret is actually secret. *See Calisi v. Unified Fin. Servs.*, 232 Ariz. 103, 106 (Ct. App. 2013); *InteliClear v. ETC Glob. Holdings*, 978 F.3d 653, 657–58 (9th Cir. 2020). Both the DTSA and AUTSA define "trade secret" broadly—e.g., formulas, patterns, compilations, programs, methods, techniques, or processes that are subject to reasonable measures to maintain the secrecy of the information. *See* 18 U.S.C. § 1839(3); A.R.S. § 44-401(4). Finally, "the information [must] derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C § 1839(3)(B); A.R.S. § 44-401(4)(a).

The trade secrets at issue here are EPA's debt portfolios, which are compilations of information a debt collector can use for debt collection in the United States. SOF ¶ 52. The debt portfolios consist of two key aspects: (1) the information within the debt portfolios, such as the debtor's name, address, and account information, and (2) the legal right or ability to use the information within the debt portfolios to collect the debts. SOF ¶ 53. The data comprising the former aspect is not generally known outside of EPA and contains consumer credit information, the disclosure of which is strictly prohibited by law. SOF ¶ 54. Additionally, EPA takes reasonable and strict measures to protect its debt

portfolios. SOF ¶ 55. These measures include password-protected databases, dual-layer database access protection, and storage off-site by a private professional server database provider certified to provide security measures for financial information. SOF ¶ 55. EPA entered into confidentiality agreements to protect this data, too. SOF ¶ 56. Thus, because the debt portfolios contain both the identities of debtors and the right to collect from them, they are highly sought after by debt collection agencies like EPA, who spend substantial amounts of money to acquire them. Thus, the debt portfolios are trade secrets.

### 3.2.    Knap misappropriated EPA's trade secrets by failing to return the debt portfolios to EPA upon his removal and by his continued use of them.

EPA must also show Knap misappropriated the debt portfolios—*i.e.*, via improper acquisition, with knowledge of their secrecy, and via use, including disclosure, of the trade secret. 18 U.S.C. § 1839(5), A.R.S. § 44-401(2)(a), (b)(i)–(iii). Knap admits he obtained access to EPA's debt portfolios through his position with EPA. SOF ¶ 57. EPA's counsel, Milo Poplar, emailed Knap to notify him of his removal and demand the return of EPA's property, which includes EPA's proprietary interest in the debt portfolios. SOF ¶ 24. Despite testifying he received this email, Knap deliberately chose not to comply. SOF ¶¶ 25, 59–60. Instead, Knap replied with his refusal to acknowledge his removal and to return EPA's materials. SOF ¶ 24. Knap acknowledged in a declaration filed with this Court on May 7, 2024, he "possessed some of the debtor portfolios that had been purchased in the names of EPA USA Inc. These include LoanMe Business, ASE Credit Union, and NASSAU." SOF ¶ 61.

Knap further admits that "after February 14, 2024, [he] continued to operate EPA." SOF ¶ 27. In his May 2025 deposition, Knap confirmed he *still* had access to information in EPA USA's debt portfolios in his OneDrive. SOF ¶ 62. This establishes the

most egregious form of trade secret misappropriation: knowing and willful retention after explicit demand for return.

Thus, Knap's continued unauthorized use of EPA's trade-secret debt portfolios, which were wrongfully retained despite demands for their return, damages EPA by funneling away profits that rightfully belong to EPA. Thus, based on the uncontroverted facts, EPA prevails on its trade secret misappropriation claims.

**4.      EPA is entitled to summary judgment on its CFAA claim for Knap's unauthorized access of EPA's computers.**

The Computer Fraud and Abuse Act ("CFAA") imposes liability on anyone who intentionally accesses a computer without authorization or exceeds authorized access, and as a result of such conduct, causes damage and loss. 18 U.S.C. § 1030(a)(5)(C); *Xfinity Mobile v. Globalgurutech LLC*, No. CV-22-01950-PHX-SMB, 2025 WL 1397110, at *14 (D. Ariz. May 14, 2025). The CFAA also imposes liability on an individual who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA authorizes civil action against a violator, provided that the intrusion causes loss aggregating at least $5,000 in value during any one year. 18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I).

Here, Knap accessed EPA's computers to obtain and delete key data. SOF ¶ 65–79. Knap also impaired EPA's ability to access its own accounts by failing to provide working login information. SOF ¶¶ 71–74. This misconduct harmed EPA, for which EPA is entitled to recover under the CFAA. SOF ¶¶ 77–79.

### 4.1. EPA's computers, which are used in interstate commerce, qualify as "protected computers" under the CFAA.

The CFAA defines a "protected computer" as one "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). "As a result, the prohibition now applies—at a minimum—to all information from all computers that connect to the Internet." *Van Buren v. United States*, 593 U.S. 374, 379 (2021).

Here, EPA's computers qualify as "protected computers" under the CFAA. At minimum, they are connected to the Internet, through which EPA conducts its debt collection business, which in turn involves interstate commerce. SOF ¶ 63. Specifically, EPA's computers contain debt portfolios and other client information across multiple states, including Credit Union of Texas, which has branches in Texas. SOF ¶ 64.

### 4.2. Knap accessed EPA's computers "without authorization" after his removal.

Under the CFAA, "without authorization" essentially means accessing a computer without permission. *See hiQ Labs, Inc. v. LinkedIn Corp.,* 31 F.4th 1180, 1198 (9th Cir. 2022). In other words, a user with "authorization" is not subject to "limitations on access," whether those limitations are "code-based" or "contained in contracts or policies." *Id.* (citing *Van Buren*, 593 U.S. at 390 n.8). Thus, the authorization "gate" is down in situations where authorization "has either never been given or *has been revoked*." *Id.* at 1199 (emphasis added).

Here, the undisputed facts show Knap accessed EPA's computers without authorization after his removal from all positions with the company on February 13–14, 2024. Knap was properly removed as a director and officer of EPA by the company's sole shareholder, El Palo Alto, on February 13, 2024. SOF ¶ 22. Knap was expressly notified of his removal on February 14, 2024, and was explicitly requested to return all of EPA's property, passwords, corporate filings, books, and records in his care, possession, custody, or

control. SOF ¶ 24. Knap admitted in his deposition that he received the notice of removal around February 14 or 15, 2024, yet he continued to access EPA's computers after that date. SOF ¶ 25. Knap admits he accessed EPA's computers after February 14, 2024, to obtain information from EPA's debt portfolios. SOF ¶ 68. This constitutes intentionally accessing protected computers without authorization to obtain information. 18 U.S.C. § 1030(a)(2)(C). Knap has specifically admitted to accessing EPA's QuickBooks and copying EPA's information in its cloud storage accounts after February 14, 2024. SOF ¶¶ 66, 69. Knap stored debtors' person information in his personal Smartsheets. SOF ¶ 70.

Knap does not dispute that he continued to access EPA's computers after his removal. Instead, he claims he was not properly removed from his positions. This argument fails as a matter of law because the undisputed evidence shows that El Palo Alto, as the sole shareholder of EPA, had the legal authority to remove Knap from his positions and did so through proper corporate actions. SOF ¶¶ 21–23. Even if Knap subjectively believed his removal was improper, this does not negate the fact that his access was objectively unauthorized under the CFAA after he was expressly directed to return all of EPA's passwords, effectively revoking his permission to access EPA accounts. SOF ¶ 24.

### 4.3. EPA suffered damage and loss due to Knap's unauthorized access to and destruction of EPA data.

The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition before the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). These definitions focus on "technological harms—such as the corruption

of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 593 U.S. at 392. The harm is analogous "to the traditional computer 'hacker' scenario—where the hacker *deletes information*, infects computers, or crashes networks." *Xfinity Mobile*, 2025 WL 1397110, at \*14 (quoting *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1185 (E.D. Cal. 2010)) (emphasis added). And while neither the Ninth Circuit nor the Supreme Court have opined on what "impairment to the integrity or availability" means, other circuits have interpreted the definition's plain language to mean that "damage" occurs when one "diminishes a plaintiff's ability to use that system or any associated data," such as when a defendant resets passwords without authorization. *See, e.g., SkyHop Tech., Inc. v. Narra*, 58 F.4th 1211, 1226 (11th Cir. 2023); *United States v. Soybel*, 13 F.4th 584, 595 (7th Cir. 2021); *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015); *see also RN Ent., LLC v. Clement*, 380 F. Supp. 3d 711, 718–19 (M.D. Tenn. 2019) (finding damage where former employees withheld passwords, deleted emails, and otherwise impaired the plaintiff's access to its website and email servers).

Likewise, the undisputed facts establish that Knap caused damage to EPA's protected computers by remotely deleting EPA's files and documents that had been shared on a Google Drive. SOF ¶ 72. Knap also prevented EPA from accessing its own computers by withholding administrative login credentials after February 14, 2024. SOF ¶ 71. Additionally, Knap refused to provide EPA with working login information for numerous service providers and companies that EPA uses, thereby impairing EPA's ability to access its own data and systems. SOF ¶ 74. Knap did not provide EPA access to its Google Suite until July 23, 2024. SOF ¶ 75. The Google Suite housed, among many other things, emails sent to and from epa-usa.com emails and "all copies" of information. SOF ¶ 76. Knap's misconduct created a substantial operational disruption that required significant resources to investigate, assess, and remediate. SOF ¶ 77.

### 4.4.    EPA's losses exceeded $5,000.

The undisputed facts also indicate EPA suffered a loss exceeding $5,000 due to Knap's unauthorized access and damage to EPA's computers, as required by § 1030(c)(4)(A)(i)(I). Costs incurred in analyzing, investigating, and responding to a CFAA violation constitute a loss within the meaning of the CFAA. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016).

Here, EPA has had to incur costs to investigate the damage caused by Knap's unauthorized access, including piecing together information needed to restart its operations. SOF ¶ 77. EPA also suffered business losses because its clients were unable to make payments on their debts due to the website shutdown. SOF ¶ 78. EPA also sustained damages to its data, programs, and computers in an amount well over $5,000 aggregated over a one-year period. SOF ¶ 79.

Based on the undisputed facts, EPA is entitled to summary judgment on its CFAA claims as a matter of law.

## CONCLUSION

For these reasons, EPA respectfully requests that the Court grant this amended motion for partial summary judgment.

Dated: May 5, 2026

Respectfully submitted,

**GRIFFITH BARBEE PLLC**

/s/ *Michael Barbee*

Michael Barbee, *Pro Hac Vice*
Texas Bar No. 24082656

Casey Griffith, *Pro Hac Vice*
Texas Bar No. 24036687

Joshua Yun, *Pro Hac Vice*
Texas Bar No. 24120335

1722 Routh Street, #910
Dallas, TX 75201
Tel: (214) 446-6020
*Michael.Barbee@griffithbarbee.com*
*Casey.Griffith@griffithbarbee.com*
*Joshua.Yun@griffithbarbee.com*

Brian J. Foster, #012143
Ross P. Meyer, #28473

**FOSTER LAW PARTNERS**

4402 N. 36th Street, #127
Phoenix, AZ 85018
Tel: (602) 509-7345
*brian@fosterlawpartners.com*
*ross@meyerpllc.com*

**Attorneys for Plaintiff EPA USA Inc.**